[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11283
_____

D.C. Docket No. 6:13-cv-01591-GAP-GJK


CATHERINE S. CADLE,

Plaintiff - Appellant,

versus

GEICO GENERAL INSURANCE COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 30, 2016)

Before WILLIAM PRYOR and FAY, Circuit Judges, and ROBRENO,[*] District
Judge.

FAY, Circuit Judge:

_____

[*] Honorable Eduardo C. Robreno, United States District Court for the Eastern District of
Pennsylvania, sitting by designation.

Catherine S. Cadle appeals judgment as a matter of law granted to GEICO General Insurance Company ("GEICO") in her bad-faith diversity action, controlled by Florida law.  We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Underlying Facts

On July 27, 2007, Cadle was injured in an automobile accident on I-95, when she was rear-ended by Derek S. Friend.  Cadle was insured by GEICO under a stacked uninsured motorist ("UM")[1] policy with a $75,000 limit.  Friend was insured by Allstate under a policy with a $25,000 limit.

Following the accident, Cadle consulted her primary-care physician, who prescribed three weeks of physical therapy, which did not alleviate Cadle's pain.  In August 2007, she was referred for an MRI of her cervical spine and a neurosurgical consultation.  This resulted in pain management, including epidural injections.  Between August 2007 and June 2008, Cadle had ten facet or nerve blocks, which required anesthesia.  None effectively managed her pain.  Cadle had

---

[1] Under Florida law and applicable in this case, "uninsured motorist" encompasses "underinsured motorist."  Fla. Stat. § 627.727(3)(b) ("[T]he term 'uninsured motor vehicle' shall . . . be deemed to include an insured motor vehicle when the liability insurer thereof [h]as provided limits of bodily injury liability for its insured which are less than the total damages sustained by the person legally entitled to recover damages.").  Section 627.727(3) "sets forth the circumstances where an insured motor vehicle will be considered 'uninsured,' such as when the vehicle is underinsured because the 'liability insurer' provided limits of liability lower than the damages sustained." *Young v. Progressive Se. Ins. Co.*, 753 So. 2d 80, 85 (Fla. 2000) (citing Fla. Stat. § 627.727(3)(b)).

a pre-existing-neck injury that had required surgery in France in 1989,[2] but she had been doing well prior to the July 27, 2007, automobile accident.

After evaluating Cadle's medical records, GEICO offered $500 to settle her UM claim on June 3, 2008. Cadle's attorney responded by demanding the $75,000 UM limit on June 11, 2008, and including all her medical records. On July 11, 2008, GEICO offered $1,000 to settle Cadle's claim and noted "[t]here was no final evaluation provided in your demand giving any permanency to your client, which leaves a question regarding threshold breach [of Florida Statutes § 627.727(7)]." Pl.'s Tr. Ex. 8A. Cadle rejected GEICO's offer.

On September 17, 2008, Cadle filed her first Civil Remedy Notice ("CRN") under Florida Statutes § 624.155 against GEICO. Almost fourteen months after Cadle's accident, the CRN advised she was still under the care of her treating physician and a neurosurgeon with whom she had discussed surgical intervention; she continued to require pain management. Her medical bills were "in excess of fifty thousand dollars ($50,000.00) and . . . continually increasing." Pl.'s Tr. Ex. 9A at 2.

During the 60-day, safe-harbor or cure period, all GEICO requested were Cadle's medical records from her 1989 surgery in France. It did not increase its

---

[2] Cadle had cervical spine surgery to stabilize her neck in 1989. The surgery occurred in Paris and resulted in the placement of a metal plate in the front of Cadle's neck. The injury that is the subject of this bad-faith claim occurred in the same physical location as her previous surgery.

settlement offer.  In a letter dated November 17, 2008, the GEICO adjuster again noted "there was no final evaluation report submitted in the [June 11, 2008, $75,000] demand giving any permanency for Ms. Cadle, which leaves a questionable threshold breach [of § 627.727(7)]."  Pl.'s Tr. Ex.10A at 1.

In March 2009, Cadle sued GEICO and filed a second CRN on April 2, 2009.  This CRN noted continuing treatment and possible surgical intervention.  Pl.'s Tr. Ex. 11A.  Because this CRN was approaching expiration, the GEICO adjuster faxed Cadle's attorney a May 29, 2009, letter stating inability to reach him.  The attorney left a voicemail for the adjuster that day and claims he had not received any GEICO attempts to communicate with him.  The adjuster returned the attorney's call during which the attorney explained Cadle was going to have surgery during the 2009 holiday season, because conservative measures had failed.  The adjuster denies this call occurred.

On December 15, 2009, Cadle had surgery, because of the pain she had continued to experience.  The surgery consisted of opening the front of her neck, removing the twenty-year-old facet from her prior surgery, and replacing it with a larger facet to stabilize her neck.  Cadle returned to work on January 4, 2010, with a neck collar and bone stimulator.

GEICO contended Cadle did not treat for approximately ten months before her surgery.  During that period, Cadle's primary-care physician prescribed

4

Oxycodone, and she did rehabilitation exercises at home.  She used the time to save money and vacation days so she could have the surgery and recover during the holidays, while providing care for her three daughters and two stepsons.

On January 6, 2010, Cadle's attorney sent her operative report to the GEICO staff counsel assigned to her UM case.  On January 13, 2010, the staff counsel requested additional information regarding Cadle's treatment and medical bills.  Her attorney responded "the total medical bills . . . are now $123,132.49, which is the amount that will be given to a jury for consideration . . . .  There are still $51,155.35 of the previous amount that remains unpaid."  Def.'s Tr. Ex. 22A.  Instead of tendering its policy limits, GEICO served Cadle with a proposal for settlement in February 2010.

**B. State UM Trial**

In March 2013, Cadle's UM claim was tried to a jury in the Circuit Court of Brevard County.  At that time, none of Cadle's doctors had assigned her a permanency rating, although she had not reached maximum medical improvement.  On March 8, 2013, the jury found Cadle had sustained a permanent injury within a reasonable degree of medical probability as a result of the July 27, 2007, accident and awarded her a verdict of $900,000.  In his Partial Final Judgment, the state trial judge reduced the verdict amount to $816,636.31, after applying "set-offs for collateral sources and the prior bodily injury settlement."  *Cadle v. GEICO Gen.*

*Ins. Co.*, No. 05-2009-CA-013025 (Fla. Cir. Ct. June 20, 2013). The judge further

stated:

> GEICO GENERAL INSURANCE COMPANY elects to reduce the amount of the gross verdict to the underinsured motorist (UM) policy limits. However, this limitation shall not prejudice or limit in any manner whatsoever, the Plaintiff's ability to seek and recover additional damages, remedies, and causes of action, including, but not limited to an insurance company bad faith cause of action. Partial Final Judgment is therefore entered against Defendant, GEICO GENERAL INSURANCE COMPANY, and in favor of the Plaintiff, CATHERINE S. CADLE, in the sum of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS [UM policy limit], together with interest thereon . . . .

*Id.* GEICO did not appeal this state judgment.

## C. Federal Bad-Faith Trial

On October 15, 2013, Cadle filed this first-party, bad-faith diversity case in

the Middle District of Florida against GEICO for failure to settle her claim, when it

could and should have done so.[3] GEICO moved for partial summary judgment and

sought a determination the jury $900,000 verdict in the underlying state UM case

was not binding as a measure of the damages in the federal bad-faith case. Cadle

disagreed and maintained, if she proved bad faith, her damages were fixed at

$900,000, less appropriate set-offs, from the state UM trial. In denying the GEICO

motion for partial summary judgment, the district judge commented: "Florida law

---

[3] GEICO eventually authorized settlement up to $19,575.26 but did not tender this amount to Cadle, because they were "not in the same ball park." Pl.'s Tr. Ex. 15A at GLC 004611.

6

provides a statutory remedy for first party bad faith, but unfortunately does not establish a procedure for determining damages; and the law in this regard is in a state of flux." *Cadle v. GEICO Gen. Ins. Co.*, No. 6:13-cv-1591-Orl-31GJK, 2014 WL 4983791, at *1 (M.D. Fla. Oct. 6, 2014).

The three-day trial was conducted December 1-3, 2014. On cross examination of Cadle's bad-faith expert, Paul Dolbow, GEICO's attorney questioned him concerning whether GEICO would have had any indication that Cadle had sustained a permanent injury in the subject accident:

> Q. In this case, when GEICO received the demand package dated June 11, 2008, there was not a single medical record stating that Mrs. Cadle had suffered a permanent injury from the accident, was there?
>
> A. *Not that I saw*.

Trial Tr. vol. II at 236 (Dec. 2, 2014) (emphasis added). On redirect, Cadle's attorney's attempt to rehabilitate his expert's testimony was unavailing:

> Q. Prior to the surgery, were there any medical records in Mrs. Cadle's file from which you could infer a permanent injury?
>
> A. *No*.

*Id.* at 241 (emphasis added).

At the close of Cadle's case, GEICO moved for a directed verdict:

> Your honor, the defense moves for a directed verdict on the basis that the plaintiff has failed in their burden of proof. Specifically, the claim is that GEICO

7

acted in bad faith because GEICO did not accept a demand for $75,000 in underinsured motorist benefits.

And to make my motion brief, I will simply assert that *the plaintiffs just presented an expert witness who testified that at no time prior to the surgery was there any record indicating a permanent injury to Ms. Cadle nor was there any evidence presented to GEICO from which permanent injury could be inferred.*

Under those circumstances, she would be entitled to recover only her out-of-pocket expenses; and there has been no evidence put on in this trial as to what, if any, out-of-pocket expenses she sustained. So we move for a directed verdict.

*Id.* at 245 (emphasis added). Cadle's counsel then addressed the lack of additional

medical records:

On the one hand, GEICO argues [Cadle] didn't treat for almost a year. On the other hand, during that period of time they say, "You didn't give us any more medical records."

Well, you can't have it both ways. You can't have her not have more medical records and then complain she didn't give you more medical records.

JUDGE: *She didn't have any more medical records.*

CADLE'S COUNSEL: Right, and she explained why, because she knew she had to have surgery.

There isn't—we know what the records are. There isn't a note that says—

JUDGE: *There is nothing in that record that says GEICO was on notice that she had to have surgery. It's just not there.*

*Id.* at 249 (emphasis added).

Following the argument by Cadle's counsel that there was a reasonable inference from her medical records she needed surgery, the judge specifically noted the testimony of Cadle's expert witness:

> *That's your own expert.  I'm sorry, but when you call an expert, you're kind of stuck with what that expert says; and he pretty much pulled the rug out from under your claim. . . . [The expert] also said there was no evidence of a threshold breach at the time.  So, you know, I mean, that's what he said.*

*Id.* at 252 (emphasis added).  The judge, however, decided to reserve ruling on GEICO's motion for judgment as a matter of law.  GEICO rested without calling any witnesses, because its witnesses had testified in Cadle's case.

GEICO had requested a jury instruction on an insured's burden of proof to recover noneconomic damages in a UM claim under § 627.727(7).  Following closing arguments and the jury's retiring to deliberate, GEICO renewed its motion for judgment as a matter of law.  The judge again reserved deciding the motion. On December 3, 2014, the jury found Cadle had proved by a preponderance of the evidence GEICO had acted in bad faith by failing to settle her underinsured motorist claim.  The judge gave GEICO fourteen days to file a written motion to substantiate its motion for judgment as a matter of law with the opportunity for Cadle to respond.

GEICO based its renewed motion for judgment as a matter of law on Cadle's "fail[ure] to present any evidence that [she] had sustained a permanent injury

9

which would have entitled [her] to non-economic damages and thus no reasonable jury could conclude that GEICO acted in bad faith in its handling of [her] UM claim."  GEICO's Renewed Mot. for J. as a Matter of Law at 1.  Specifically, GEICO argued Cadle's expert "testified that when GEICO received [Cadle's] demand for the $75,000 policy limits and the two Civil Remedy Notices, there were no medical records which indicated that [Cadle] had suffered a permanent injury."  *Id.* at 10.  Even Cadle's attorney in the state UM case "testified that there was nothing in the documents that he provided to GEICO which indicated that [Cadle] suffered a permanent injury as a result of the [automobile] accident."  *Id.* at 11.  Consequently, Cadle "was only entitled to economic damages, which [i]ndisputably were not $75,000 and therefore [Cadle] was not entitled[] to, as a matter of law, the UM policy limits."[4]  *Id.* at 12.  "[B]ased on the information provided to GEICO, [Cadle] did not have any out-of-pocket expenses," because she "had recovered $25,000 from the torfeasor's bodily injury policy and $10,000 in PIP [personal injury protection] coverage and had health insurance to cover her medical expenses."  *Id.* at 12-13.  In opposition, Cadle argued a totality-of-the-circumstances analysis and concluded whether GEICO showed bad faith in failing to settle her UM claim remained a question for the jury, not the judge.

---

[4] GEICO noted, when it became aware Cadle "underwent a surgery, [it] tendered the $75,000 policy limits, which were rejected," so "GEICO had no opportunity to settle [Cadle's] UM claim after she underwent surgery."  GEICO's Renewed M. for J. as a Matter of Law at 12 n.3.

In determining whether judgment as a matter of law was the correct resolution of Cadle's bad-faith action, the district judge noted Cadle had filed a CRN on September 17, 2008, which alleged "GEICO [had] acted in bad faith by failing to settle . . . Cadle's claim in violation of Florida Statutes § 624.155," and an amended CRN "was filed on April 2, 2009, shortly after Cadle had filed suit against GEICO in the Brevard County Circuit Court. *The sixty day cure period under Florida law expired on June 1, 2009*." Order at 3, *Cadle v. GEICO Ins. Co.*, No. 6:13-cv-1591-Orl-31GJK (M.D. Fla. Feb. 24, 2015) (granting GEICO's renewed motion for judgment as a matter of law) (emphasis added). The state jury's UM verdict for Cadle of $900,000 on March 8, 2013, was reduced to the $75,000 policy limit; consequently, Cadle sought "the balance of that verdict, less setoffs, $741,636.31, plus attorney's fees and costs" in the bad-faith case. *Id.*

Because Cadle may recover only economic damages (medical expenses and wages) if her injuries do not meet the threshold requirement of permanent injury under Florida Statutes § 627.737(2), the judge reasoned "the vitality of her $75,000 demand and GEICO's good faith obligation to pay it depends entirely on whether GEICO had reason to believe, *prior to June 2009*, that . . . Cadle had suffered a permanent injury." *Id.* at 4 (emphasis added). After review of all the evidence presented at trial, the judge concluded no evidence supported Cadle's claim "GEICO was aware or should have known that she had a permanent injury prior

11

[to] January 2010 when [Cadle's attorney] informed GEICO of [her] December 2009 surgery," including her expert witness. *Id.* at 5. Although Cadle contends GEICO should not have relied on her production of medical records "and instead should have obtained its own set of medical records and requested an independent medical examination of . . . Cadle," the judge concluded "the insurer's duty does not go this far." *Id.*

The judge commented:

> Reliance on the documents provided by and representations made by [Cadle's] lawyer cannot amount to bad faith, and [Cadle] has cited no authority to the contrary. Rather, the insurer is entitled to rely on the documents provided by [Cadle's] counsel, and the representations made by him concerning his client's claim.

*Id.* The judge additionally noted: "Moreover, there is no evidence that such additional investigations would have produced a different result."[5] *Id.* The judge granted GEICO's renewed motion for judgment as a matter of law. Judgment was entered on February 26, 2015; Cadle timely appealed. We review whether judgment as a matter of law correctly was entered for GEICO, when Cadle failed to establish permanent injury under § 627.727(7) for noneconomic damages within the cure period.

---

[5] GEICO did engage a radiologist, Dr. Michael J. Foley, to review all of Cadle's cervical-spine-radiology tests, including MRIs. Dr. Foley's February 2, 2010, report for GEICO concluded: "The findings discussed above appear chronic and degenerative in nature. I see nothing acute to suggest the findings noted are related to the date of [the] accident of 7/27/07." Def.'s Tr. Ex. 23 at 7.

## II. ANALYSIS

On appeal, Cadle first argues there was sufficient evidence presented at trial for the jury to have concluded her injury was permanent at the time of her settlement demand.  Second, Cadle contends her burden of proof under the totality-of-the-circumstances analysis does not require her to prove a permanent injury at the time of her settlement demand.  For these reasons, Cadle requests our court "to reverse the district court's judgment and restore the jury's verdict, or alternatively, certify this question of first impression to the Florida Supreme Court."  Appellant's Initial Br. at 15.

### A. Review Standards

In diversity cases, we apply the substantive law of the forum state.  *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009).  We review de novo a district judge's granting judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and apply the same standard as the trial judge.  *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005).  In reviewing the record evidence, we draw all inferences in favor of the nonmoving party.  *Id.*  "[W]e compare the grounds originally argued by the movant in its Rule 50(a) motion with those cited by the trial court in granting a renewed motion for judgment as a matter of law."  *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998).  "If the grounds argued in a motion under Rule 50(a) are closely related to those argued

13

in a Rule 50(b) motion, then setting aside a jury's verdict is no surprise to the non-movant. No Seventh Amendment right is ambushed." *Id.* (citation and internal quotation marks omitted). Great variance between the old and new grounds precludes a judge from relying "on the new grounds to set aside the jury's verdict." *Id.*

In considering a Rule 50(b) motion after the jury verdict, "only the sufficiency of the evidence matters. The jury's findings are irrelevant." *Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1363 (11th Cir. 2014) (citation and internal quotation marks omitted). "'[T]hat Rule 50(b) uses the word "renewed" makes clear that a Rule 50(b) motion should be decided in the same way it would have been decided prior to the jury's verdict, and that the jury's particular findings are not germane to the legal analysis.'" *Id.* (quoting *Chaney v. City of Orlando*, 483 F.3d 1221, 1228 (11th Cir. 2007)). Judgment as a matter of law for a defendant is appropriate, "when there is insufficient evidence to prove an element of the claim, which means that no jury reasonably could have reached a verdict for the plaintiff on that claim." *Collado*, 419 F.3d at 1149; *see Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1344-45 (11th Cir. 2000) ("A Rule 50(b) motion should only be granted where reasonable jurors could not arrive at a contrary verdict." (citation, internal quotation marks, and alteration omitted)).

14

**B. Interrelationship Between UM and Bad-Faith Trials: Binding Effect of Damages Determination in First-Party UM Trial**

Since this case was argued in our court, the Florida Supreme Court has issued a definitive opinion clarifying the interrelationship between UM and bad-faith trials. *Fridman v. Safeco Ins. Co. of Ill.*, 185 So. 3d 1214 (Fla. 2016).[6] Because resolution of this case is governed by *Fridman* and the Florida law it explains, we review the applicable instruction of *Fridman*. In *Fridman*, the Florida Supreme Court made clear "that the insured is entitled to a jury determination of the amount of damages in the UM action." *Id.* at 1222. "'[A]bsent a determination of the existence of liability on the part of the uninsured tortfeasor *and the extent of the plaintiff's damages*, a cause of action cannot exist for a bad faith failure to settle.'" *Id.* (quoting *Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289, 1291 (Fla. 1991) (answering Eleventh Circuit certified question whether bad-faith claim had to be asserted in the UM action against the insurer for UM benefits)). Consequently, "the insured is entitled to a determination of liability and the full extent of damages *before* litigating the bad faith cause of action." *Id.* at 1223 (emphasis added).

"Because we have concluded that the insured is entitled to a determination of the full extent of damages in the UM action, it follows that such a determination

---

[6] We note neither party has filed supplemental authority concerning the directly applicable, post-oral-argument issuance of *Fridman* by the Florida Supreme Court.

15

is binding in the subsequent bad faith action against the same insurer." *Id.* at 1225. "If the amount of the UM verdict is not binding as an element of damages in the bad faith litigation, it would allow the insurer—or the insured, if the verdict were less than anticipated—a second bite at the proverbial apple." *Id.* That would result in "serious, unintended consequences," including relitigating the damages again in a bad-faith trial, "inconsistent verdicts," and "comity issues between state and federal courts," which would be a "waste of judicial and litigant resources." *Id.* (citation and internal quotation marks omitted). Consequently, "there must be an opportunity for both parties to obtain appellate review of any timely raised claims of error in the determination of damages obtained in the UM trial, *for the very reason that it becomes binding as an element of damages in the subsequent bad faith case*." *Id.* at 1226 (emphasis added).

The "'damages in first-party bad faith actions are to include the *total amount of a claimant's damages, including any amount in excess of the claimant's policy limits* without regard to whether the damages were caused by the insurance company'—damages that are, in substance, a penalty." *Id.* at 1223 (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 60 (Fla. 1995)) (emphasis added). "Nothing in our precedent suggests that the eventual tendering of the policy limits renders the UM case moot." *Id.* The *Fridman* court "conclude[ed] that an insured is entitled to a determination of liability and the full extent of his or

16

her damages in the UM case prior to filing a first-party bad faith action." *Id.* at

1224.  That court "reject[ed] the suggestion that errors in the computation of the

UM verdict are necessarily harmless where *the damages reflected in the UM*

*verdict are significant relative to the UM policy limits because the damages will*

*eventually become part of the subsequent bad faith case*."  *Id.* at 1228 (emphasis

added).[7]  Consequently, the Florida Supreme Court "conclude[d] that the

determination of damages obtained in the UM action becomes a binding element of

damages in the subsequent bad faith litigation against the same insurer."  *Id.*

## C. Procedural Requirements for Bad-Faith Case Against an Insurer

### 1. Insurer's Good-Faith Duty to Insured

The *Fridman* court recognized "the Florida Legislature created a statutory

first-party bad faith cause of action" by enacting § 624.155 in 1982. 185 So. 3d at

[7] In an extensive footnote, the *Fridman* court notes Florida federal-district-court cases, including *Cadle* (regarding the summary judgment order, denying GEICO's partial-summary-judgment motion arguing the $900,000 jury verdict in the UM case was not binding), where the "issue of the binding effect of the underlying verdict for damages in excess of the policy limits and the ability to appeal the verdict for errors appears to have created concerns for Federal District Court judges in Florida."  185 So. 3d at 1227 n.5.  The court also addresses two such district-court cases our court has affirmed.  *Harris v. Geico Gen. Ins. Co.*, 961 F. Supp. 2d 1223 (S.D. Fla. 2013), *aff'd*, 619 F. App'x 896 (11th Cir. 2015); *King v. Gov't Emps. Gen. Ins. Co.*, No. 8:10-cv-977-T-30AEP, 2012 WL 4052271 (M.D. Fla. Sept. 13, 2012), *aff'd*, 579 F. App'x 796, 801-03 (11th Cir. 2014).  The Florida Supreme Court states:

> In both cases, on appeal, the Eleventh Circuit Court of Appeals declined to address the issue of whether the excess verdict in the underlying UM action was binding as to damages in the subsequent first-party bad faith action because it affirmed the decision that the insurer was found by the jury not to have acted in bad faith.

*Fridman*, 185 So. 3d at 1227 n.5.

1220 (citing Fla. Stat. § 624.155(1)(b)1.[8] "This provision extended the duty of an insurer to act in good faith in handling claims brought by its own insured under a UM policy and exposed the insurer to the consequences of failing to do so." *Id.* The Florida Supreme Court has delineated the duty of good faith an insurer owes its insured:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. . . . . The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because *the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured*, negligence is relevant to the question of good faith.

*Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 668-69 (Fla. 2004) (quoting *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)) (ellipsis in original) (emphasis added).

While the determination of whether an insurer acted in bad faith in handling an insured's claims generally is decided under the totality of the circumstances,

---

[8] "Any person may bring a civil action against an insurer when such person is damaged [b]y the commission of any of the following acts by the insurer: Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests . . . ." Fla. Stat. § 624.155(1)(b)1.

18

each case is decided on its facts. *Id.* at 680. "Although the issue of bad faith is ordinarily a question for the jury, [the Florida Supreme Court] and the district courts [of appeal] have, in certain circumstances, *concluded as a matter of law that an insurance company could not be liable for bad faith.*" *Id.* (emphasis added). Where a judge concludes as a matter of law a plaintiff has not established her bad-faith case against an insurer, he must remove the case from the jury for decision.

### 2. Civil Remedy Notice and Sixty-Day Cure Period

"As a condition precedent to filing a civil action [for bad faith] under section 624.155, 'the Florida Department of Financial Services and the authorized insurer must have been given 60 days' written notice of the violation.'" *Fridman*, 185 So. 3d at 1220 (quoting Fla. Stat. § 624.155(3)(a)) (alteration omitted). "This notice is commonly referred to as the 'civil remedy notice.'" *Id.* Under the statute: "No action shall lie if, within 60 days after filing notice, the damages are paid or the circumstances giving rise to the violation are corrected." *Id.* (quoting Fla. Stat. § 624.155(3)(d)).

"The sixty-day window is designed to be a cure period that will encourage payment of the underlying claim, and avoid unnecessary bad faith litigation." *Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1282 (Fla. 2000) (citation and internal quotation marks omitted). This cure period "provides insurers with a final opportunity 'to comply with the claim-handling obligations

when a good-faith decision by the insurer would indicate the contractual benefits are owed.'" *Fridman*, 185 So. 3d at 1220 (quoting *Talat Enters.*, 753 So. 2d at 1284). "[I]f an insurer fails to respond to a civil remedy notice within the sixty-day window, there is a presumption of bad faith sufficient to shift the burden to the insurer to show why it did not respond." *Id.* (citation and internal quotation marks omitted). "Importantly, in both first- and third-party bad faith actions, an element of damages includes any amount in excess of the policy limits." *Id.* at 1221 (citing Fla. Stat. § 627.727(10)). But, "[t]he statutory cause of action for extra-contractual damages simply never comes into existence until expiration of the sixty-day window without the payment of the damages owed under the contract." *Talat Enters.*, 753 So. 2d at 1284.

The Florida Supreme Court has held expressly "a claim for bad faith pursuant to section 624.155(1)(b)1 is founded upon the obligation of the insurer to pay when all conditions under the policy would require an insurer exercising good faith and fair dealing towards its insured to pay." *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000). This obligation requires timely evaluation and payment of "benefits owed on the insurance policy." *Id.* But the Florida Supreme Court noted

> the denial of payment does not mean an insurer is guilty of bad faith as a matter of law. The insurer has a right to deny claims that it in good faith believes are not owed on a policy. Even when it is later determined by a court or

20

arbitration that the insurer's denial was mistaken, there is no cause of action if the denial was in good faith.

*Id.*

### 3. Permanent-Injury Requirement for Noneconomic Damages

The *Fridman* court recognized § 627.727(10) "clearly and unambiguously reflects the legislative intent that the damages in section 624.155 bad faith actions *shall* include any amount in excess of the policy limits."[9]  185 So. 3d at 1221.  In contrast to this expansive coverage, the Florida Supreme Court has explained the requirement of a permanent injury for recovery of noneconomic damages:

> Section 627.737(2)(b) provides that a plaintiff may recover damages in tort for pain, suffering, mental anguish, and inconvenience (noneconomic damages) because of a bodily injury arising out of the use of a motor vehicle *only in the event that the injury "consists in whole or in part of . . . [p]ermanent injury within a reasonable degree of medical probability*."  Thus, as long as part of the bodily injury arising out of the motor vehicle accident involves a permanent injury "within a reasonable degree of medical probability," the plaintiff can recover noneconomic damages related to his pain, suffering, mental anguish, and inconvenience for all of

---

[9] Section 627.727(10) provides:

> The damages recoverable from an uninsured motorist carrier in an action brought under s. 624.155 shall include the total amount of the claimant's damages, *including the amount in excess of the policy limits*, any interest on unpaid benefits, reasonable attorney's fees and costs, and any damages caused by a violation of a law of this state. The total amount of the claimant's damages is recoverable whether caused by an insurer or by a third-party tortfeasor.

*Fridman*, 185 So. 3d at 1221 (quoting Fla. Stat. § 627.727(10)).

21

> the injuries related to the accident.  Additionally, pain is only one of the noneconomic damages provided in the statute.  Suffering, mental anguish and inconvenience are also compensable noneconomic damages.

*Wald v. Grainger*, 64 So. 3d 1201, 1207 (Fla. 2011) (alteration in original) (emphasis added).[10]  Consequently, insureds seeking noneconomic benefits from their uninsured-motorist carrier, first must meet the permanent-injury requirement of § 627.737(2)(a)-(d).[11]  "In view of section 627.727(7), it is clear that the statute

---

[10] The interrelated Florida Statutes § 627.727(7) and § 627.737(2) state and define the permanency requirements for noneconomic damages:

> The legal liability of an uninsured motorist coverage insurer does not include damages in tort for pain, suffering, mental anguish, and inconvenience unless the injury or disease is described in one or more of paragraphs (a)-(d) of s. 627.737(2).

Fla. Stat. § 627.727(7).

> In any action of tort brought against the owner, registrant, operator, or occupant of a motor vehicle with respect to which security has been provided as required by ss. 627.730-627.7405, or against any person or organization legally responsible for her or his acts or omissions, a plaintiff may recover damages in tort for pain, suffering, mental anguish, and inconvenience because of bodily injury, sickness, or disease arising out of the ownership, maintenance, operation, or use of such motor vehicle only in the event that the injury or disease consists in whole or in part of:
>     (a) Significant and permanent loss of an important bodily function.
>     (b) Permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement.
>     (c) Significant and permanent scarring or disfigurement.
>     (d) Death.

Fla. Stat. § 627.737(2)(a)-(d).

[11] The district judge instructed the jury on the permanent-injury requirement of § 627.727(7) for recovery of noneconomic damages:

22

does not require an insurance carrier to provide uninsured motorist coverage for

pain, suffering, mental anguish, and inconvenience unless the threshold

requirements of section 627.737(2) have been met."  *Dauksis v. State Farm Mut.*

*Auto. Ins. Co.*, 623 So. 2d 455, 456 (Fla. 1993).[12]

The Florida Supreme Court has explained the interrelationship of §

627.727(7) and § 627.737(2) regarding the medical proof required for a permanent

injury resulting from an automobile accident:

> *[T]he statute[s] require[] that the plaintiff establish the
> existence of a physical injury and prove that this injury is
> permanent.*  Both elements must be proven "within a
> reasonable degree of medical probability."  We find that
> the statute[s] do[] not limit the evidence to objective
> findings to establish the existence or permanency of a
> physical injury. . . .

---

> Florida law provides in pertinent part that a claimant may
> recover damages in tort for, quote, "pain, suffering, mental
> anguish, and inconvenience because of bodily injury arising out
> of" an automobile accident "only in the event that the injury
> consists in whole or in part of:
>> "(a) significant and permanent loss of an important bodily
>> function;
>> "(b) permanent injury within a reasonable degree of medical
>> probability;
>> "(c) significant and permanent scarring or disfigurement; and,
>> "(d) death."

Trial Tr. vol. III at 24-25 (Dec. 3, 2014) (quoting Fla. Stat. § 627.737(2)(a)-(d)); *see* Fla.
Standard Jury Instruction 501.3.

[12] "It is axiomatic that all parts of a statute must be read *together* in order to achieve a consistent
whole.  Where possible, courts must give full effect to *all* statutory provisions and construe
related statutory provisions in harmony with one another." *Forsythe v. Longboat Key Beach
Erosion Control Dist.*, 604 So. 2d 452, 455 (Fla. 1992) (citations omitted).

23

> However, the statute[s] do[] provide a check on the evidence with [their] requirement that the existence and permanency of the injury be established "*within a reasonable degree of medical probability*."  By the terms of the statute[s], a mere recitation of the plaintiff's subjective complaints of pain is insufficient to prove a permanent injury—*the plaintiff must also present expert medical testimony to establish the existence and permanency of the alleged injury*.

*City of Tampa v. Long*, 638 So. 2d 35, 37-38 (Fla. 1994) (quoting Fla. Stat. § 627.737(2)(b)) (emphasis added).  To recover noneconomic damages against an insurance carrier, a plaintiff must establish *both the existence and permanency of the alleged injury resulting from the subject automobile accident*.

**D. Application**

On appeal, Cadle argues the district judge erred by granting GEICO's Rule 50(b) motion, which overruled the jury determination of bad faith and thereby precluded her obtaining the monetary remainder of her recovery found by the jury in the UM trial.  She further contends there was sufficient evidence in the record to support the jury verdict that GEICO acted in bad faith in failing to pay her claim.  Generally, judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure is appropriate when a party has been heard fully on its claim during a jury trial, and the district judge finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party.  Fed. R. Civ. P. 50(a)(1).  While the question of bad faith by the insurer in processing an insured's claim is

24

usually for the jury, the verdict must be supported by legally sufficient evidence. *Boston Old Colony*, 386 So. 2d at 785.

For Cadle to recover noneconomic damages, she had to show the existence and permanency of her injury from the July 27, 2007, accident within the sixty-day cure period after making her claim to GEICO. The testimony at her bad-faith trial by both her medical expert and UM attorney confirmed that at no time during the cure period did Cadle produce to GEICO medical evidence of the permanency of her injury. Noneconomic damages are available under an insurance policy only if the plaintiff incurs a "permanent injury," which must be established "within a reasonable degree of medical probability" within the cure period. Fla. Stat. § 627.737(2)(b).

While witness credibility determinations traditionally are a jury function,

> the court should review the record as a whole[;] it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as *that evidence supporting the moving party that is uncontradicted and unimpeached*, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods. Inc*., 530 U.S. 133, 151, 120 S. Ct. 2097, 2110 (2000) (citations omitted) (emphasis added). By reserving ruling on GEICO's summary judgment motion and Rule 50(a) motion, the district judge

25

clearly found the testimony of Cadle's expert at the bad-faith trial was

determinative.  The former Fifth Circuit has explained:

> [T]he trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness, where, as here, the testimony bears on technical questions of medical causation beyond the competence of lay determination.  Indeed, *such opinion testimony may form the basis for a directed verdict.*

 *Webster v. Offshore Food Serv.*, 434 F.2d 1191, 1193 (5th Cir. 1970) (citations

omitted) (emphasis added).

In granting GEICO's renewed motion for judgment as a matter of law, the

judge explained:

> [D]espite numerous opportunities, [Cadle's attorney] never provided any evidence of a permanent injury and never even attempted to address the threshold issue [of permanent injury], except to note that his client was considering surgical intervention.  This possibility of surgical intervention is not, however, notice of permanent injury.
> Absent evidence of a permanent injury, there was no basis for GEICO to value [Cadle's] UM claim at or above $75,000.  Accordingly, *there was no credible evidence presented to the jury to support a finding of bad faith.*

Order at 6, *Cadle v. GEICO Ins. Co.*, No. 6:13-cv-1591-Orl-31GJK (footnote

omitted) (emphasis added).

In an analogous case, involving an automobile accident, a UM trial in state

court, and a bad-faith trial in federal court, our court affirmed the district judge's

26

granting an insurer's Rule 50(b) motion, because the plaintiff-appellant "did not provide expert medical evidence of permanency during the safe-harbor period." *Harris v. GEICO Gen. Ins. Co.*, 619 F. App'x 896, 899 (11th Cir. 2015) (unpublished but recognized for persuasive authority).  We noted Harris "fail[ed] to cite any evidence that expert medical testimony as to permanency was presented at the UM trial.  Therefore, no reasonable juror could find GEICO denied Harris non-economic damages in bad faith."  *Id.* at 899-900.

"If an uninsured motorist is not liable to the insured for damages arising from an accident, then the insurer has not acted in bad faith in refusing to settle the claim."  *Blanchard*, 575 So. 2d at 1291.  Under the clear language of Florida law regarding noneconomic damages in an insurance bad-faith case, the district judge was correct to conclude the jury had no evidence from which it reasonably could have found GEICO had acted in bad faith.  There was no evidence of permanency during the cure period, which is required under Florida law.  The district judge's granting GEICO's Rule 50(b) motion is **AFFIRMED.**