[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15340
Non-Argument Calendar
_____

D.C. Docket No. 8:16-cv-00031-MSS-TBM


ANA DANIELS,

Plaintiff - Appellant,

versus

GEICO GENERAL INSURANCE COMPANY,
a foreign corporation,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 3, 2018)

Before WILLIAM PRYOR, ANDERSON and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Ana Daniels brought a statutory bad faith action pursuant to Florida Statute § 624.155 against Defendant GEICO General Insurance Company.  The district court granted summary judgment for Defendant.  We affirm.

## I.     BACKGROUND

### A.     Factual Background

Defendant insured Plaintiff and her husband, Clark Daniels, under an automobile policy.  On April 7, 2009, in Broward County, Florida, non-party Russell McKinley backed up and struck Plaintiff's vehicle while she was stopped at a tollbooth.  Plaintiff reported the accident to Defendant that same day.  At the time of the accident, Plaintiff's policy provided non-stacked uninsured/underinsured motorist ("UM") coverage in the amount of $10,000 per person, and $20,000 per occurrence.  Plaintiff's policy also contained "Personal Injury Protection" ("PIP") and "Additional PIP" coverage, providing Plaintiff with 100% coverage for her $10,000 PIP benefits.

The parties communicated over the next several months regarding Plaintiff's property damage claim and bodily injury claim.  On the night of the accident, Plaintiff contacted Defendant to provide additional information regarding the accident.  On April 9, April 13, and April 21, Plaintiff's husband contacted Defendant regarding the status of Plaintiff's property damage claim with McKinley's insurance carrier.  Adjuster Shanitra Coleman faxed an Affidavit of

2

Coverage to Plaintiff's counsel, Julie Hager ("Attorney Hager"), on May 5, 2009, and mailed a certified copy of Plaintiff's policy to Attorney Hager on May 14, 2009.

On July 20, 2009, Plaintiff filed a Civil Remedy Notice ("CRN") pursuant to Florida Statute § 624.155, with the Florida Department of Financial Services. The CRN cited "claim delay" and "unsatisfactory settlement offer" as the reasons for the notice. The CRN stated that Defendant violated § 624.155(1)(b)(1) by "[n]ot attempting in good faith to settle claims when under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." The CRN also stated that Defendant violated § 624.155(1)(b)(3) by "failing to promptly settle claims, when the obligation to settle a claim has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage."

On July 23, 2009, Defendant received a demand packet, dated July 20, 2009, from Attorney Hager. Attorney Hager's letter summarized Plaintiff's medical treatment, explained her current condition, noted that her medical bills totaled approximately $4,223, and demanded Plaintiff's $10,000 UM policy limits. Plaintiff's demand packet included Plaintiff's initial evaluation from her physical

therapist, progress notes from physical therapy sessions, and Plaintiff's billing records.  Plaintiff's demand packet also contained the CRN.

Following receipt of the CRN, Adjuster George Graymez corresponded with Attorney Hager on July 31, 2009.  Adjuster Graymez expressed Defendant's concern that Attorney Hager attached the CRN to the demand, when "[Defendant] [had] just received [Plaintiff's] demand and never extended an offer to [Plaintiff] for it to be considered unsatisfactory."  Adjuster Graymez requested that Attorney Hager provide medical records, including an MRI Report and film referenced in Hager's letter, and a PIP file authorization to view Plaintiff's PIP file.

Over two months later, on October 5, 2009, Attorney Hager faxed additional medical records from Orthopaedic Center of South Florida to Defendant.  Attorney Hager's cover letter to the fax noted that the CD of Plaintiff's MRI that Defendant requested would be provided under separate cover.

Notwithstanding that assurance, Attorney Hager waited more than two years to send the requested MRI CD, mailing it on November 6, 2011, to Defendant. Attorney Hager faxed a copy of the MRI report to Defendant a month later, on December 9, 2011.  Adjuster Graymez forwarded the report and the film on CD to Dr. Paul Koenigsberg for review, and Adjuster Graymez received Dr. Koenigsberg's report on December 14, 2011.  Dr. Koenigsberg concluded that the MRI revealed only age-related degenerative disease of the cervical spine.

Defendant faxed Dr. Koenigsberg's report to Attorney Hager on December 16, 2011, as reflected in Defendant's Activity Log.  Defendant's records also reflect that Defendant offered Plaintiff $4,200 at that time to settle her claim.

On February 28, 2012, Attorney Hager mailed Adjuster Graymez a letter stating that since the accident Plaintiff "has suffered from numbness and tingling pain down her right arm, neck pain, difficulty turning her neck, and pain in her shoulder blades."  Plaintiff did not provide any additional medical records or bills, but again demanded that Defendant tender Plaintiff's full $10,000 UM policy limits.

Adjuster Graymez responded, noting that "2 years and 10 months has passed since your client's final diagnosis was rendered" and concluding that "[i]t is evident that her complaints have resolved considering there was no additional treatment sought since that time."  Based on Plaintiff's submitted medical records and MRI, Defendant offered $4,700 for "full and final settlement" of Plaintiff's claim.

Almost a year later, on February 27, 2013, Attorney Hager sent Adjuster Graymez a cervical MRI CD from June 4, 2012, with corresponding medical records indicating that Plaintiff had follow-up visits with Dr. Kenneth Jarolem on May 31, 2012 and June 8, 2012.  Dr. Koenigsberg reviewed the cervical MRI and

5

concluded that Plaintiff's injuries were degenerative in nature and unrelated to the accident.

## B.    Procedural History

On April 5, 2013, Plaintiff filed a lawsuit in Broward County Circuit Court against McKinley and Defendant.  On May 31, 2013, during discovery in the underlying lawsuit Plaintiff produced an updated PIP log, which showed that Plaintiff's medical bills had increased to $13,768.74.

Plaintiff's case went to trial, and, on February 13, 2015, a jury returned a verdict in favor of Plaintiff for $203,000.  The jury awarded Plaintiff $3,000 for past medical expenses and $200,000 for future medical expenses.  The jury also determined that Plaintiff was not entitled to an award for pain and suffering as a result of permanent injury and declined to award damages to Plaintiff's husband for loss of consortium.

On January 5, 2016, Plaintiff filed this statutory bad faith action pursuant to Florida Statute § 624.155 against Defendant.  On November 1, 2017, the district court granted Defendant's motion for summary judgment.  The district court noted that this Court has held based on the Florida statute that "an insurer does not act in bad faith for refusing to tender policy limits during the CRN Cure Period [i.e. the 60 days following the filing of a CRN] for amounts in excess of established economic damages in the absence of a permanent injury."  The district court found

6

that "Plaintiff's medical records provided to [Defendant] during the CRN Cure Period showed that Plaintiff's medical expenses were less than half the amount of her PIP policy limits and there was no permanent injury."  The district court concluded that "[Defendant's] refusal to tender the $10,000 UM policy limits during the CRN Cure Period, which was based on the medical records it possessed and Plaintiff's established economic damages at that time, was not made in bad faith."

## II.    DISCUSSION

### A.    Standard of Review

In diversity cases, we apply the substantive law of the forum state.  *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009).  "We review *de novo* the district court's grant of summary judgment."  *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quoting *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Viewing the evidence in the light most favorable to the nonmoving party, "[t]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Greenberg*, 498 F.3d at

7

1263 (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)).

### B.    Insurer's Good-Faith Duty to Insured

As we explained in *Cadle v. GEICO General Insurance Company*, Florida Statue § 624.155 created a statutory first-party bad faith cause of action that "extended the duty of an insurer to act in good faith in handling claims brought by its own insured under a UM policy and exposed the insurer to the consequences of failing to do so."  838 F.3d 1113, 1123 (11th Cir. 2016) (quoting *Fridman v. Safeco Ins. Co. of Illinois*, 185 So.3d 1214, 1220 (Fla. 2016)).  "The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."  *Id.* (quoting *Berges v. Infinity Ins. Co.*, 896 So.2d 665, 668–69 (Fla. 2004)).

"While the determination of whether an insurer acted in bad faith in handling an insured's claims generally is decided under the totality of the circumstances, each case is decided on its facts."  *Id.* (quoting *Berges*, 896 So.2d at 680).  "Although the issue of bad faith is ordinarily a question for the jury, [the Florida Supreme Court] and the district courts [of appeal] have, in certain circumstances, *concluded as a matter of law that an insurance company could not be liable for bad faith.*"  *Id.* at 1123–24 (emphasis in original) (quoting *Berges*, 896

So.2d at 680); *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1359 (11th Cir. 2015) (affirming summary judgment where Plaintiff failed to provide sufficient evidence for a reasonable jury to find that insurer acted in bad faith).

### C.    Civil Remedy Notice and Sixty-Day Cure Period

"As a condition precedent to filing a civil action [for bad faith] under section 624.155, 'the Florida Department of Financial Services and the authorized insurer must have been given 60 days' written notice of the violation.'" *Cadle*, 838 F.3d at 1124 (quoting *Fridman*, 185 So.3d at 1220).  Under the statute:  "No action shall lie if, within 60 days after filing notice, the damages are paid or the circumstances giving rise to the violation are corrected." *Fridman*, 185 So.3d at 1220 (quoting Fla. Stat. § 624.155(3)(d)).  "The sixty-day window is designed to be a cure period that will encourage payment of the underlying claim, and avoid unnecessary bad faith litigation." *Cadle*, 838 F.3d at 1124 (quoting *Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So.2d 1278, 1282 (Fla. 2000) (citation and internal quotation marks omitted)).  "The statutory cause of action for extra-contractual damages simply never comes into existence until expiration of the sixty-day window without the payment of the damages owed under the contract." *Talat Enters.*, 753 So.2d at 1284.  Here, the cure period extended from the July 20, 2009, filing of the CRN until September 18, 2009.

**D.      Plaintiff Submitted Insufficient Evidence During the Cure Period to Require Defendant to Tender the $10,000 UM Policy Limit**

Relying on both economic and noneconomic damages to justify her claim to UM coverage, Plaintiff demanded from Defendant the full $10,000 policy limit for that coverage.  Plaintiff does not dispute that her economic damages (medical bills) during the sixty-day cure period following her July 20, 2009, demand letter and CRN totaled only $4,223.[1]  That amount is less than half of the $10,000 benefits available under her PIP coverage, meaning that this element of damages could not trigger any coverage under the UM provision of the policy.  Plaintiff's claim that Defendant acted in bad faith by not surrendering the entire $10,000 UM policy limits is therefore viable only if a reasonable jury could find that Defendant failed to pay Plaintiff's claim for noneconomic damages in bad faith.

"For [Plaintiff] to recover noneconomic damages, she had to show the existence and permanency of her injury from the [April 7, 2009], accident within the sixty-day cure period after making her claim to [Defendant]."  *Cadle*, 838 F.3d at 1126.  "Noneconomic damages are available under an insurance policy only if the plaintiff incurs a 'permanent injury,' which must be established 'within a reasonable degree of medical probability' within the cure period."  *Id*. (quoting Fla. Stat. § 627.737(2)(b)).

---

[1]  Years after the cure period, Plaintiff underwent additional treatment and her medical bills had increased to $13,768.74.  Though Plaintiff sought to recover that amount in her underlying lawsuit, the jury awarded only $3,000 in past medical damages.

10

In granting Defendant's motion for summary judgment, the district court

likened this case to *Cadle*, and other cases rejecting bad faith claims:

> Here, the Court likewise finds that within the CRN Cure Period Plaintiff did not demonstrate within a reasonable degree of medical probability that she had suffered a permanent injury that would allow recovery for non-economic damages.  Nor did Plaintiff provide GEICO medical records establishing that her economic damages and injury would or even potentially could exceed the remaining PIP limits such that it would trigger the UM coverage.  Specifically, Plaintiff's medical records provided to GEICO during the CRN Cure Period showed that Plaintiff's medical expenses were less than half the amount of her PIP policy limits and there was no permanent injury.  No additional medical records were provided during that time. Plaintiff presented GEICO with no evidence that would warrant tendering the UM policy limits.  Hence, GEICO's refusal to tender the $10,000 UM policy limits during the CRN Cure Period, which was based on the medical records it possessed and Plaintiff's established economic damages at that time, was not made in bad faith.

Order [Dkt. 33] at 11, *Daniels v. GEICO Ins. Co.*, No. 8:16-cv-00031-MSS-TBM.

We agree with the district court.

Viewing the evidence in the light most favorable to Plaintiff, no reasonable

jury could conclude that Defendant acted in bad faith in processing Plaintiff's UM

claim.  None of the medical records included in Plaintiff's demand packet

indicated that Plaintiff suffered a permanent injury within a reasonable degree of

medical probability, as required by Florida law.  Fla. Stat. § 627.737(2)(b).

Plaintiff's demand packet merely included an initial evaluation from Plaintiff's

physical therapist, progress notes from therapy sessions, and billing records, none

of which indicates any permanent injury.  Although Attorney Hager's demand

11

packet cover letter referenced an MRI performed on Plaintiff and an opinion expressed by Dr. Jarolem regarding the severity of Plaintiff's injury, the demand packet did not include an MRI CD or any reports from Dr. Jarolem.

Plaintiff asserts that testimony from her expert, Susan Kaufmann, and Adjuster Graymez raises a genuine issue of material fact concerning Defendant's access to the complete reports of Dr. Jarolem during the cure period. Kaufmann testified that Defendant could have requested permission to view the PIP file. Kaufmann also testified that Adjuster Graymez stated in his deposition that "all medical records go to him before going to the PIP department" and she reasoned that "he has seen all the medical records." However, the testimony cited by Plaintiff to establish that he had Dr. Jarolem's reports during the cure period relates to an instance years later, in September 2012, when Adjuster Graymez was sent something in error that belonged to somebody else and he transferred it out. Although Adjuster Graymez would sometimes erroneously receive PIP material, nothing in the record establishes that he reviewed PIP material before transferring it to the appropriate recipient, much less that he received and reviewed the reports of Dr. Jarolem during the cure period. To the contrary, Adjuster Graymez testified that he "can't touch the PIP file." The record also establishes that Adjuster Graymez requested a PIP file authorization to view Plaintiff's PIP file from Attorney Hager during the cure period. Plaintiff failed to submit any evidence that

12

she provided the requested authorization[2] or that the PIP file even contained the Jarolem reports during the cure period.  The evidence is insufficient to allow a reasonable jury to conclude that Adjuster Graymez had the reports of Dr. Jarolem during the cure period.  "Inferences based on speculation and a 'mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment.'"  *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)).

Relying on *Kafie v. Northwestern Mutual Life Insurance Company*, 834 F. Supp. 2d 1354, 1359 (S.D. Fla. 2011), Plaintiff also argues that medical evidence submitted well after the cure period raises a genuine issue of material fact and establishes Defendant's bad faith when considering the totality of the circumstances.  In *Cadle*, decided after the district court's decision in *Kafie*, we rejected plaintiff's argument that "the totality-of-the-circumstances analysis does not require her to prove a permanent injury at the time of her settlement demand." *Cadle*, 838 F.3d at 1121.  The district court relied on *Cadle* to grant summary judgment[3] but Plaintiff did not address it on appeal, much less demonstrate that the

---

[2]  Attorney Hager testified that "I don't see that [a PIP authorization] was furnished."

[3]  The district court also rejected Plaintiff's reliance on *Kafie*, noting that it predates *Cadle* and "simply determined that litigation in the underlying UM case 'itself is not the basis for the claim identified in the CRN but is *merely potentially relevant* to the bad faith claim' as further corroboration of the bad faith previously asserted."  Order [Dkt. 33] at 11, *Daniels v. GEICO Ins. Co.*, No. 8:16-cv-00031-MSS-TBM (quoting *Kafie*, 834 F. Supp. 2d at 1369 (emphasis added)).

13

district court erred in applying *Cadle* to Plaintiff's claim. "The insurer has a right to deny claims that it in good faith believes are not owed on a policy. Even when it is later determined by a court or arbitration that the insurer's denial was mistaken, *there is no cause of action if the denial was in good faith*." *Cadle*, 838 F.3d at 1124 (quoting *Vest. v. Travelers Ins. Co.*, 753 So.2d 1270, 1275 (Fla. 2000) (emphasis added)).

## III.    CONCLUSION

The district judge correctly concluded that Plaintiff offered no evidence from which a jury reasonably could have found Defendant had acted in bad faith in denying Plaintiff's UM claim. Plaintiff's economic damages were less than her PIP benefits and she did not submit to Defendant medical evidence of her alleged permanent injury to establish noneconomic damages during the cure period. The district court therefore correctly granted summary judgment to Defendant.[4] We therefore **AFFIRM**.

---

[4] Plaintiff is not entitled to attorneys' fees because she did not prevail in her appeal. Fla. Stat. § 627.428.

14